## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| SOLVET SERVICES, LLC | Civil Action No. 6:20-0861 |
| versus | Judge David C. Joseph |
| HD VENTURES, LLC, ET AL. | Magistrate Judge Carol B Whitehurst |

## REPORT AND RECOMMENDATION

Before the undersigned, on referral from the district judge, is the Motion to Enter Summary Judgment Enforcing Settlement Agreement [Doc. 91] filed by the plaintiff, Solvet Services, LLC ("Solvet") against defendants McKinley Investment, LLC ("McKinley") and Halen Bach ("Bach"). The motion is unopposed. For the following reasons, it is RECOMMENDED that the motion be GRANTED.

### FACTUAL AND PROCEDURAL BACKGROUND

### The Underlying Lawsuit

The instant lawsuit arises out of a business dispute that occurred during the Covid-19 pandemic. All facts are taken from the plaintiff's Complaint; none are disputed. On April 18, 2020, in the early stages of the pandemic, Solvet was awarded a $2,572,200.00 contract with the Federal Bureau of Prisons, U.S. Department of Justice ("DOJ"), to deliver 180,000 boxes of blue nitrile power-free disposable

1

gloves, which were to be delivered to six separate regions covering the whole of the United States on or before May 12, 2020.

On April 28, 2020, Solvet contracted with defendant Hitched and issued a purchase order to purchase the gloves from Hitched in an attempt to fulfill the DOJ Contract. In the instant lawsuit, Solvet alleged that the CRO of Hitched, Christopher Walker, falsely and fraudulently represented to Solvet in telephone calls, e-mail correspondence, and text messages that Hitched procured the gloves and they would be delivered by May 12, 2020 in conformance with the DOJ Contract. Despite this agreement, Solvet alleged that Hitched never informed Solvet that there was a problem procuring the gloves, that the gloves would not arrive on time, or that the transaction as originally represented would not occur. On May 14, 2020, two days after the gloves were required to be delivered, Hitched admitted that it was unable to procure the gloves.

At that point, Hitched passed Solvet off to another broker, HD Ventures. Hitched vouched for HD Ventures, representing that HD Ventures would be able to quickly procure the gloves and guaranteed that HD Ventures was a respectable and quality company. Based on these representations, Solvet alleged that it contracted with HD Ventures and issued a purchase order for the purchase of 180,000 boxes of gloves at $12.00 a box to be delivered as quickly as possible. Solvet alleges that it was agreed among all the parties that HD Ventures would source the gloves from

OfficeMart and OfficeMart would fulfill the purchase order by May 22, 2020. To further this contract, Solvet, HD Ventures, and OfficeMart executed an escrow agreement. Solvet then wired the escrow agent $2,160,000.00. According to the Complaint, on May 18, 2020, $875,250.00 from escrow was wired to OfficeMart as an advance deposit for the manufacturing and the delivery of the gloves.

Thereafter, OfficeMart contracted with defendant McKinley Corporation, Ltd. through its chairman Halen Bach, to manufacture all 180,000 boxes of gloves. Solvet alleged that it did not communicate with McKinley or any person associated with McKinley and was wholly reliant upon information from HD Ventures and OfficeMart concerning the contract with McKinley. Following the wire transfer to OfficeMart, Solvet discussed the pending transaction with Jason Angel, the CEO of OfficeMart, who represented that the transaction was complete, and the gloves had been procured and would be delivered directly to the DOJ no later than May 22, 2020. Solvet subsequently relayed this information to the DOJ.

Solvet alleges that Angel continued to make promises by telephone, in e-mails, and by text messages related to the delivery the gloves, and in all of these communications, OfficeMart and HD Ventures represented that various activities were underway by and between OfficeMart and McKinley and the gloves would be delivered. On May 22, 2020, the gloves did not arrive as promised. Communications from Angel continued, in which Angel stated that the gloves would

be shipped, although the delivery dates and the number of gloves that would be shipped changed. At all times, Solvet was told that the gloves had been procured and would be delivered. However, HD Ventures and OfficeMart never supplied or delivered any of the gloves to Solvet or the DOJ. On June 23, 2020, the DOJ terminated Solvet's contract for failure to deliver the gloves within the time frame necessary to meet the DOJ's needs related to the COVID-19 epidemic.

By mid-June, after it became clear that HD Ventures and OfficeMart were not able to procure the gloves as promised, Solvet terminated the contract and demanded a return of the $2,160,000.00 previously wired to the escrow agent. On June 12, 2020, the escrow agent released $1,284,750.00 back to Solvet after confirmation that OfficeMart and HD Ventures failed to supply the gloves according to the contract and escrow agreement. On June 16, 2020, Solvet made demand on OfficeMart and HD Ventures for the immediate return of the advanced deposit. OfficeMart and HD Ventures have failed to return the remaining $875,250.00, with OfficeMart claiming that it no longer has the deposit in its possession, as that money has already been paid to its supplier, McKinley.

Solvet filed suit in this Court on July 7, 2020, seeking judgment against OfficeMart and Angel on claims of breach of contract, lost profits, and related damages. Solvet further alleges claims under the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §1962, *et seq.*, and the Louisiana

Racketeering Act, La. Rev. Stat. §15:1351, *et seq*. ("LRA") against all defendants (OfficeMart, Angel, Bach, and McKinley). Solvet seeks treble damages, costs and attorney fees under 18 U.S.C. §1964 (c) and La. Rev. Statute §15:1356, together with interest.

### The Settlement Agreement

On February 26, 2020, Solvet, McKinley and Bach entered into a "Settlement Agreement and Release," wherein McKinley agreed to pay to Solvet the remainder of the advanced deposit. It is important to note that this settlement was not reached with the assistance of the Court, and no settlement was placed on the record. Solvet never moved to dismiss the case, which has been and is still pending.

According to the terms of the Settlement Agreement and Release, Solvet agreed to accept $606,700.00 in full settlement of all claims if that entire sum was paid on or before June 1, 2022. In the event that that amount was not paid by June 1, 2022, McKinley agreed to pay the entirety of the alleged owed amount, $706,700.00, per the terms set forth below:

> **SECTION 3. Settlement Payment, Release, and Other Provisions**.
> In consideration of the mutual covenants and representations set forth in this Agreement, the Parties agree as follows:
>
> **a) PAYMENT FROM MCKINLEY**: For good and valuable consideration, McKinley agrees to pay and Solvet agrees to accept the sum of Six Hundred, Six Thousand and Seven Hundred and 0/100 Dollars ($606,700.00 USD) so long as full and complete payment is received by Solvet and/or its counsel on or before June 1, 2022 (the "June Payment Option"). In the event that wire confirmations (to the

instructions provided in Paragraph 5, below), are not provided to Solvet and/or its counsel on or before June 1, 2022, then, as an alternative to the June Payment Option, above, McKinley agrees to pay and Solvet agrees to accept the total sum of Seven Hundred, Six Thousand and Seven Hundred and 0/100 Dollars ($706,700.00) in principal payment payable in the terms described below in 1-5 (the "Twelve-Month Payment Option"). Such payment, regardless of whether the June Payment Option or the Twelve-Month Payment Option, represents a full and final settlement of the Litigation between Solvet, McKinley and Bach and all of Solvet's claims against Halen Bach and McKinley that were asserted or could have been asserted. For the avoidance of doubt, in no event shall the total payment amount to Solvet exceed Seven Hundred, Six Thousand and Seven Hundred and 0/100 Dollars ($706,700.00 USD) in principal payment.

> 1. Initial Payment: For good and valuable consideration, and regardless of whether McKinley complies with the June Payment Option or the Twelve-Month Payment Option, McKinley agrees to pay and Solvet agrees to accept the sum of One Hundred, Seventy-Five Thousand and 0/100 Dollars ($175,000.00 USD) of the principal amount owed, payment and receipt of which will be acknowledged by Solvet. Payment under this section shall be made per the wiring instructions below in Section 3(a)(3) on or before March 15, 2022.

> 2. Monthly Payments: Subject to the other terms and conditions of this Agreement, unless the June Payment Option is satisfied as per above, then McKinley further agrees to pay to Solvet the sum of Five Hundred, Thirty-One Thousand and Seven Hundred 0/100 Dollars ($531,700.00 USD), broken down into twelve monthly payments (the "Monthly Payments"). The Monthly Payments shall be made per the terms of the separately executed Promissory Note attached as Exhibit A. Notwithstanding this, in the event that the June Payment Option is satisfied, then the Parties hereby agree that the Promissory Note shall be adjusted, in as tax efficient a manner as possible, to comply with the terms and provisions of this Agreement.

> 3. Wiring Instructions: All Payments to Solvet shall be made by wire transfer to the following account:

[wiring information redacted]

4. Failure to Make Payment: If McKinley fails to make a Monthly Payment per the terms of the Agreement and such failure remains following notice and opportunity to cure as described in the following sentences, such uncured failure shall cause any and all remaining Monthly Payments under this Agreement to become immediately due and payable by McKinley. For avoidance of doubt, this will be calculated based on the greater amount of Seven Hundred Six Thousand Seven Hundred United States Dollars ($706,700.00 USD). In each event whereby McKinley fails to make a Monthly Payment when due, Solvet shall give McKinley notice pursuant to Section 15 herein of such failure ("CURE NOTICE") and seven (7) business days following such CURE NOTICE, during which McKinley shall have the opportunity to cure any such failure. If McKinley cures such failure within said seven (7) business days, there shall be no acceleration of remaining Monthly Payments, nor shall there be any other consequences. If McKinley fails to cure, Solvet may enforce this Agreement in the Litigation in United States District Court, Western District of Louisiana. If Solvet enforces this Agreement in court, Solvet shall be relieved of the confidentiality obligations in this Agreement to the extent necessary to pursue such enforcement.[1]

\* \* \*

**b) DISMISSAL OF CLAIMS**: Solvet will request that the United States District Court in the Western District of Louisiana dismiss, with prejudice, and seal all documents filed in connection with the Litigation that pertain to, involve, or mention McKinley and/or Halen Bach, within seven business days of receipt of the last of the following payments: (i) the initial payment from McKinley of One Hundred, Seventy-Five Thousand and 0/100 Dollars ($175,000.00) of the principal amount owed, and either (ii) the last of the Monthly Payments of Five Hundred, Thirty-One Thousand and Seven Hundred 0/100

---

[1] *See* Settlement Agreement and Release, attached as Exhibit A to Solvet's motion, Doc. 91, at Section 3(a)(1)-(4).

7

Dollars ($531,700); or full payment of the June Payment Option by June 1, 2022, as set forth herein.[2]

**c) RELEASE BY SOLVET**: By execution of Agreement and upon receipt of the last of the following payments:

1. The initial payment from McKinley of One Hundred, Seventy-Five Thousand and 0/100 Dollars ($175,000) of the principal amount owed, and either

2. All Monthly Payments per the terms of the separately executed Promissory Note attached as Exhibit A and equaling Five Hundred, Thirty-One Thousand and Seven Hundred 0/100 Dollars ($531,700.00), and the applicable interest rate of 5.75%; or

3. Full payment by June 1, 2022 (i.e., the June Payment Option), which shall, until paid, be subject to the applicable interest rate of 5.75%.

\* \* \*

**SECTION 9. Choice of Law, Remedies for Breach**. This Agreement is governed by the laws of the State of Louisiana, exclusive of any choice of law rules that would require application of the law of any other state. All Parties to this Agreement consent to the jurisdiction of United States District Court in the Western District of Louisiana for any actions related to the Litigation and/or to enforce, interpret, or for breach of any term of this Agreement. Nothing in this Agreement will be construed as, or constitute, a release of any party's rights to enforce the terms of this Agreement. The prevailing party in any action to enforce this Agreement shall be entitled (both at trial and upon appeal) to attorney's fees, interest, costs, and expenses of litigation."[3]

---

[2] *Id*. at Section 3(b).
[3] *Id*. at Section 9.

On the same day they executed the Settlement Agreement and Release, Solvet, McKinley and Bach also executed a Promissory Note ("the Note"), which provides in relevant part:

> The Payors shall make twelve (12) monthly payments over a one (1) year period. Unless prepayment is made before June 1, 2022, then each monthly payment shall be in the amount of Forty-Five Thousand, Seven Hundred Dollars and 45/100 ($45,700.45) as evidenced by the debt schedule attached hereto as Exhibit A. The first monthly payment will be due April 15, 2022, and the principal and all accrued interest shall be paid in full no later than April 15, 2023.
>
> \* \* \*
>
> Upon the happening of any Event of Default specified in the preceding paragraph, then so long as Payee provides notice and Payors fail to cure such Event of Default within seven (7) business days of written notice by the Payee to the Payors, the Payee may by written notice to Payors declare the entire principal amount of this Note plus interest accrued hereon to be immediately due and payable without presentment, demand, protest, notice of protest or dishonor or other notice of default of any kind, all of which are hereby expressly waived by Payors.[4]

Under the Settlement Agreement, the first payment of $175,000.00 was due on March 15, 2022. McKinley and Bach failed to make payment. When no payment was made, on April 12, 2022, Solvet provided formal notice that McKinley and Bach were in default of the Settlement Agreement by failing to make the initial March 15, 2022 payment and gave McKinley and Bach seven days to cure the default per the terms of the Agreement. On April 19, 2022, Solvet provided formal notice that

---

[4] *See* PROMISSORY NOTE, attached as Exhibit B to Solvet's motion, Doc. 91.

McKinley and Bach were in default of the Note by failing to make the April 15, 2022, payment of $45,700.45, and gave McKinley and Bach seven days to cure the default per the terms of the Note. In the instant motion, Solvet alleges that to date, McKinley and Bach have not cured the default. Solvet argues that McKinley and Bach's failure to make payments pursuant to the Settlement Agreement and the Note renders them in breach of both documents. In light of that breach, Solvet requests that the entire principal amount of $706,700.00, plus interest, be immediately adjudged due and payable, as well as attorney's fees, interest, costs, and expenses of litigation as allowed under the terms of the Settlement Agreement and the Note.

## LAW AND ANALYSIS

As an initial matter, the undersigned notes that this matter was never dismissed, and this Court's jurisdiction over the case was never divested. Therefore, there is no question regarding the propriety of this Court adjudicating the instant motion. It is well-settled that a district court has the power to enforce summarily a settlement agreement reached in a case pending before it. *Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984), *citing Strange v. Gulf and South American Steamship Company,* 495 F.2d 1235, 1237 (5th Cir.1974). As this matter is still pending, this Court has jurisdiction to adjudicate the instant motion.

A threshold question, however, is what law applies to the issues before the Court. The Fifth Circuit has held that questions regarding the enforceability or

validity of settlement agreements are determined by federal law in cases where the substantive rights and liabilities of the parties derive from federal law. *See Zim Israel Navigation Co. v. Special Carriers, Inc.*, 800 F.2d 1392, 1394 (5th Cir. 1986), *citing Mid-South Towing Co.*, 733 F.2d at 389. *See also Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207 (5th Cir.1981) (Title VII); *Strange v. Gulf and South American Steamship Company,* 495 F.2d 1235 (5th Cir.1974) (general maritime law); *Cia Anon Venezolana De Navegacion v. Harris,* 374 F.2d 33 (5th Cir.1967) (general maritime law).

Where, as here, the Complaint alleges both federal and state law claims, the issue of what law applies is murkier. In this matter, the plaintiff alleges claims under the federal RICO statute, 18 U.S.C. §1962, *et seq.*, and the Louisiana Racketeering Act, La. Rev. Stat. §15:1351, *et seq.* ("LRA"), as well as state law claims of breach of contract, civil conspiracy, and fraud. Given the nature of its claims, in its Complaint, Solvet alleges jurisdiction based on both 1332 (diversity) and 1331 (federal question).

In *Coleman v. City of Opelousas*, 2021 WL 3812483 (W.D. La 7/23/2021), the plaintiff's lawsuit was originally filed in state court, where the plaintiff asserted both federal (general maritime law) and state law claims. The suit was removed to federal court on the basis of federal-question jurisdiction. In that case, the court held that enforcement of the parties' settlement agreement was governed by federal law,

11

not Louisiana state law. *Coleman v. City of Opelousas*, No. 6:20-CV-01469, 2021 WL 3812483, at *2 (W.D. La. July 23, 2021), *report and recommendation adopted*, No. 6:20-CV-01469, 2021 WL 3780027 (W.D. La. Aug. 25, 2021).

Plaintiff does not address the issue, arguing only that its claims are brought under the federal RICO statute, and therefore, federal law governs the enforceability of the Settlement Agreement. After consideration of the issue, although Solvet does allege state law claims in this matter, the transaction at issue in this case is primarily presented in the context of a RICO scheme. For this reason, and with the instruction of *Coleman*, the undersigned concludes that federal law governs the enforceability of the Settlement Agreement at issue.

A district court may summarily enforce a settlement agreement if no material facts are in dispute, and in such circumstances we review the district court's order for abuse of discretion only. *In re Deepwater Horizon*, 786 F.3d 344, 354 (5th Cir. 2015), *citing Mid–South Towing Co. v. Har–Win, Inc.*, 733 F.2d 386, 390 (5th Cir.1984) and *Harmon v. Journal Publ'g Co.*, 476 Fed.Appx. 756, 757 (5th Cir.2012). An evidentiary hearing is required only "when opposition to enforcement of the settlement is based not on the merits of the claim but on a challenge to the validity of the agreement itself." *In re Deepwater Horizon*, 786 F.3d at 354, *citing Mid–South*, 733 F.2d at 390 and *Autera v. Robinson*, 419 F.2d 1197, 1200 (D.C.Cir. 1969). In that instance, the parties must be allowed an evidentiary hearing on

disputed issues of the validity and scope of the agreement. *Id.* In this case, the defendants do not oppose the instant motion; therefore, no evidentiary hearing is required, and this Court may summarily enforce the settlement agreement if there are no disputed facts regarding the validity of the Settlement Agreement itself.

Under federal law, a settlement agreement is a contract. *Guidry v. Halliburton Geophysical Servs., Inc.*, 976 F.2d 938, 940 (5th Cir. 1992). The federal common law of contracts "uses the core principles of the common law of contracts that are in force in most states." *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003) (internal quotation marks and citations omitted). For a valid contract to exist under federal law, there must be an offer, acceptance, consideration, essential terms, and a meeting of the minds among the parties. *Johnson v. BP Exploration & Prod.*, 786 F.3d 344, 355-59 (5th Cir. 2015). "An offer is judged by the parties' overt acts and words, not by the subjective or secret intent of the offeror." *In re Deepwater Horizon*, 786 F.3d at 355. Likewise, "acceptance of an agreement is generally determined by "outward, objective manifestations of assent," and therefore "an actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous." *Bowers v. Abundant Home Health, LLC*, 2021 WL 706783, at *6 (N.D. Tex. Jan. 25, 2021), *report and recommendation adopted*, 2021 WL 693652 (N.D. Tex. Feb. 23, 2021), *citing* 2 Williston on Contracts, §6:3: Objective manifestations generally control (4th ed.).

13

"Federal law does not require settlement agreements to be reduced to writing." *E.E.O.C. v. Phillip Servs. Corp.*, 635 F.3d 164, 167 (5th Cir. 2011), *citing Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981). However, agreements to settle federal claims must be entered into voluntarily and knowingly. *See, e.g., Fulgence*, 662 F.2d at 1209. *See also Jackson v. Widnall*, 99 F.3d 710, 714 (5th Cir. 1996); *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994). "Where a party has knowingly and voluntarily agreed to settle his claims and no change of circumstances warrants repudiation of the agreement, the courts will enforce the settlement agreement." *Bell*, 36 F.3d at 449, *quoting Lyles v. Commercial Lovelace Motor Freight, Inc.*, 684 F.2d 501, 504 (7th Cir. 1982). "Absent a factual basis rendering it invalid, an oral agreement to settle a [federal] claim is enforceable against a plaintiff who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute." *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d at 1209. To determine whether a settlement agreement was knowingly and voluntarily executed, the Fifth Circuit has adopted a "totality of the circumstances" approach. *Smith v. Amedisys Inc.*, 298 F.3d 434, 441 (5th Cir. 2002), *citing O'Hare v. Global Natural Res.*, 898 F.2d 1015, 1017 (5th Cir. 1990). Generally, there is a meeting of the minds among the parties on "all of the material terms of settlement where the parties have agreed upon the monetary amount of the

settlement payment and the fact that plaintiffs will release specific claims." *In re Deepwater Horizon*, 786 F.3d at 357 n.26.

To establish that no settlement agreement was reached, a party must demonstrate that the settlement was "tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted." *Mid-South Towing*, 733 F.2d at 392. When the parties "negotiated at arms-length and there was no taint of fraud, deception, coercion[,] or overreaching, the settlement [is] binding, despite a claim of mutual mistake." *Mid-South Towing*, 733 F.2d at 392, *citing Strange v. Gulf & South American Steamship Co.*, 495 F.2d 1235, 1237 (5th Cir. 1974) (internal quotation marks omitted). The party seeking to avoid enforcement of the settlement agreement has the burden to demonstrate that it "was invalid because of fraud, duress, material mistake, or some other defense." *Amedisys*, 298 F.3d at 441. Absent these conditions, a party's alleged ignorance of specific limitations may constitute, at most, a unilateral mistake, which is insufficient to void the agreement. *See Mid-South Towing*, 733 F.2d at 392.

Finally, the undersigned is cognizant of the general favorability of settlement agreements as part of litigation, as explained by the Court in *Coleman*:

> The compromise of disputed claims is favored under federal law. Consistent with the principles listed above, district courts have the "inherent power to recognize, encourage, and when necessary enforce settlement agreements reached by the parties." In summary, then, absent a factual basis rendering the settlement agreement invalid, an oral agreement to settle a claim arising under federal law – such as the

15

> claim asserted by Mr. Coleman in this lawsuit – is enforceable against a party who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute.

2021 WL 3812483, at *4, *citing Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994); *Mid-South Towing Co.*, 733 F.2d at 391; *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33, 35 (5th Cir. 1967); *Bell v. Schexnayder*, 36 F.3d at 449.

With the foregoing in mind, this Court must determine whether an agreement was formed as to all material terms. As set forth above, a settlement agreement is a contract. *Guidry v. Halliburton Geophysical Servs., Inc.*, 976 F.2d 938, 940 (5th Cir. 1992). For a valid contract to exist under federal law, there must be an offer, acceptance, consideration, essential terms, and a meeting of the minds among the parties. *Johnson v. BP Exploration & Prod.*, 786 F.3d 344, 355-59 (5th Cir. 2015). There is a meeting of the minds among the parties on "all of the material terms of settlement where the parties have agreed upon the monetary amount of the settlement payment and the fact that plaintiffs will release specific claims." *In re Deepwater Horizon*, 786 F.3d at 357 n.26.

In this matter, the elements of offer, acceptance, and consideration are expressly set forth in both the Settlement Agreement. The parties have agreed upon the monetary amounts of the settlement payments and the fact that Solvet will release specific claims. The Settlement Agreement is signed by the CEO of Solvet and

16

Halen Bach, the CEO of McKinley, on behalf of McKinley and himself, and both signatures were notarized. There are, simply, no material disputes regarding the existence of the Settlement Agreement or the fact that it was entered into freely and voluntarily. The agreement to settle was reached and confirmed in clear, unequivocal writing, without condition, on February 26, 2022, by counsel for all parties. Neither McKinley, Halen Bach, nor an attorney for either has challenged the validity of the Settlement Agreement, which appears to have been negotiated thoroughly. Attorney Randolph Adler entered into the agreement with Bach's full knowledge, consent and understanding as evidenced by his notarized signature on the documents. As no material dispute regarding the validity and enforceability of the Settlement Agreement has been raised or is otherwise apparent from the document itself, this Court may enforce the Settlement Agreement without a plenary hearing. As neither McKinleyn or Halen Bach has proved any valid defenses to the enforcement of the agreement, the undersigned concludes that the Settlement Agreement should be enforced.

Considering the foregoing,

**IT IS RECOMMENDED** that the Motion to Enter Summary Judgment Enforcing Settlement Agreement [Doc. 91] be GRANTED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this

report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** this 23rd day of September, 2022 at Lafayette, Louisiana.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE